Opinion op the Court.
ON the 24th of May, 1808, David Booth executed to William Booth, jun. a bond in the penal sum of two thousand dollars, conditioned to be void “ if the said David shall make a good and lawful title of his light to Amy and one half of her children, being the negroes that the said David Booth is contending with William Booth, sen. in the county court of Bedford.”
This bond was by William Booth, jun. transmitted from Virginia to his father, William Booth, sen. in this country, and su.it brought thereon for the benefit of William, sen. in the name of William, jun. and judgment finally recovered against David Booth for ,$1050 in damages.
David Booth then exhibited his hill in chancery, with injunction, against both William Booth, inn. and *58 William Booth, sen. alleging, that the consideration of the bond executed by him was one of the same date given to him by William Booth, jun. conditioned “ to make or cause to be made unto the said David a good and lawful right, by William Booth, sen. to negro woman Lucy and half of her children, being part of the estate of George Booth, deceasedand that William Booth has never made such right to Lucy and her children, and is unable to do so. lie charges, that the obligations were executed in the state of Virginia, where William Booth, jun. resides, and that William, jun. is greatly embarrassed in his circumstances and William, sen. totally insolvent. He moreover charges William Booth, jun. with fraud, in having sold to him negroes to which neither he or William Booth, sen. had right, and insists that the consideration for which he gave the bond upon which judgment was recovered against him.at law, has entirely failed; and p raj's for an injunction and general relief, &c.
William Booth, jun. admjts the execution of both bonds at the same time; but denies that the bond which he gave, formed the consideration of the bond given by the complainant. He charges, that previous to and at the date of the bonds, there was a suit in chancery depending in the Bedford county court of Virginia, between the complainant, David Booth, and his father, William Booth, sen. in which the matter of controversy 'was two families of negroes, to wit, Lucy and her children, and Amy and her children; that neither of the parties then, nor for a long time, had been possessed of Lucy or her children, they having been previously sold Under execution against the estate of George Booth, deceased, to which they were supposed to belong; but notwithstanding she had been sold, the said William Booth, sen. and David Booth had set up a claim to her,' which they were litigating in the chancery suit aforesaid ; that it was confidently believed by the complainant, if he could acquire the title of William Booth, sen. that he could recover the aforesaid slaves from the . persons holding them; that he, the said William, jun. having paid some attention to the suit for his aged father, an agreement was made by him, as the friend of and acting on the part of his father, and the said David, the complainant, to compromise and settle said suit on the following terms: the said David was to take *59 a decree as a matter of course and of right against the said William Booth, sen. by which means he would be invested with all the said William Booth, sen's, title to said slaves; and the said David was then to proceed, at his own risque, costs and expense, to recover all the slaves in dispute, and when recovered was to divide them; and that to effectuate the compromise, and for no other consideration whatever, the bond was given by the said David. The answer further charges, that the said David was accordingly permitted to take a decree in the Bedford county court for all the slaves, whereby he became fully invested with the whole title to the slaves, and the bond given by the said William Booth, jun. fully fulfilled. The answer moreover alleges, that in consequence of said decree, the said David has actually taken possession of all Amy’s children, and has made attempts to procure Lucy,' but never so effectually as he might have done.
The answer admits, that the bond was executed by David for the benefit of William Booth, sen. and that suit has been brought thereon and judgment recovered, as is alledged in the complainant’s bill; and after denying the charge of his being embarrassed in his circumstances, prays to be dismissed, &c.
The answer of William Booth, sen. contains no other defence than that which is, in substance, contained in the answer of his co-defendant, William Booth, jun.
The court below, on a final hearing of the cause, dissolved the injunction, and- dismissed the bill with damages and costs.
From that decree, David Booth, the complainant, has appealed to this court.
The depositions of several witnesses are contained in the record; but they are mostly of a character illy calculated to developethe extent of the contract between the complainant and William Booth, jun. under which the obligation of each was given to the other» Some attention to the proof taken from the record of the chancery suit brought by the complainant, David Booth, against William Booth, sen. in the state of Yir-giAia, will, however, conduce to a more perfect understanding of the transaction. There is no complete tram-script from that record filed in this; but from the extracts taken from that, and which are contained in this,, and read in the court below without objection, the; *60 following facts are to be collected, namely: That some-, time in or prior to the year 1779, David Booth, the present complainant, exhibited his bill against William Booth, sen. in the county court of Bedford, in the state of Virgiuia, claiming in his own right and as the administrator and creditor of his brother, George Booth, deceased, all that part of the estate of their deceased father, George Booth the elder, consisting of negroes, &c. which he had by his last will bequeathed to them; and calling upon the said William Booth, sen. who was alleged to be the executor, to account, &c. that in 1799 the bill was answered by William Booth sen. in which he admits the making of the will by George Booth the elder, and his having, as executor, taken upon himself the burthen of the execution ofthe wiil;but,healleges, that after the legatees named in the will all came of age, a distribution of the estate of the testator between them was made, by mutual consent, according to their respective rights under the will; and that in that distribution a negro woman, Amy, wras allotted to the complainant, David, and a negro woman, Lucy, allotted to his brother, George Booth, since deceased; that both. .David and George received the possession, and held their respective negroes under the allotment aforesaid, until several years after Lucy, the negro of George, was taken and sold under an execution against his estate, and David having absconded and being indebted to him, the said W illiam Booth, he caused an attachment to be sued out against his estate, and procured his woman Amy to be sold and became himself the purchaser. Under that purchase, the said William insists, that he became the rightful owner of Amy, and in his answer charges a complete and perfect fulfilment of the will to which he was executor.
It also appears, that the master commissioner made a report to the county court of Bedford, in April, 1806, in which, after stating the accounts between the par-: ties, he draw's a balance of £60 12s. 10d. in favor of the complainant, David, against the defendant, William Booth, sen, Bui the commissioner reports, that over and above this balance, there were contended for by the complainant, David, two negroes; one he understood to be Amy, on his own account, and the other Lucy, on account of his deceased brother George; and after stating the .evidence in relation to the sale ©Í *61 fhose negroes, &c. as alleged in the answer of the defendant, William, concludes by suggesting an opinion that the demand for which Amy was sold under the attachment had been previously paid by David, and that William should account for the injury sustained, if the suit reaches the case, &c.
The complainant, David, appears also to have filed, in the county c ourt of Bedford, a supplemental bill, in which he recites the original bill and the answer thereto, suggests the fact of the same having been referred to the master commissioner and his having reported thereon, and charges that the sale of Amy, alleged by the defendant, William, in his answer to the original bill, was effected by the ex-parte and fraudulent representations of the said William, and prays that Amy may be decreed to be delivered to him, and such other and further decree as may be consistent with equity. The precise time When this supplemental bill was filed does not appear; but as it recites the fact of the master commissioner having made a report on the original bill, and the report to which we have already referred was, made in 1806, it must, we infer,^ave been filed subsequent to that time; and that inference derives additional strength from the answer of the defendant, William, to the supplemental bill, which appears not to have been filed until June, 1807. That answer contains nothing of importance to the present contest; and we have referred to it, merely for the purpose of shewing that in all probability the supplemental hill was filed subsequent to the report of the master commissioner in 1806, and to repel the inference, attempted to be drawn in argument from that report, of the right to the negroes having been previously decided by the court.
In December, 1807, the defendant, William Booth, sen. appears, likewise, to have executed and sealed a writing certifying that he acknowledged judgment in the first hill in chancery, then depending against him in the Bedford county court, in behalf of David Booth. At March court, 1808, by consent of the parties, an order was made referring the accounts filed to the master commissioner; and at theNovember court,1808, after reciting, that it appearing to the court that William Booth, sen. by a certificate filed, disclaims all title io the slaves Amy and Lucy and their increase 5 in the *62 answer named, the record contains a decree, that the complainant recover against the defendant said slaves with their increase; and the master commissioner was ordered to ascertain their names and report to court.
The certificate of disclaimer, referred to in the decree, is contained in the record, and appears to have been given by William Booth, sen. on the 8th of October, 1808.
It moreover appears, that the commissioner, in accordance to the decree, reported the names of Amy’s children and by whom they were held in possession, and such proceedings were thereafter had, as that finally they were recovered by the complainant; but as respects Lucy and her children, the extracts from the record contain no further information. It is proper further to remark, that the persons from whom Amy and her children were recovered by the complainant, appear to have obtained them from the defendant, William Booth, sen. after the suit was brought in the county court of Bedford.
In our reflections on the preceding facts, we have been incapable of drawing any inference favorable to the idea advanced in argument by the compluinar.t’s counsel, that the right to the slaves bad been decided on by the county court of Bedford, prior to May, 1808, when the obligations were given by the complainant and William Booth, jun. to each other. Before that time, a report had been made to court by tbe master commissioner, and the idea advanced in argument was 'attempted to be maintained, from the contents of that report, connected with the circumstance of the defendant’s not having produced the order of court under which the commissioner acted, and the fact of the defendant, William Booth, sen. by the writing of Decem-bei’, 1807, having certified his acknowledgment of judgment. It is obvious, however, that nothing favorable to such an idea is to be inferred from the commissioner’s report. Instead of suggesting that the right to the negroes had been decided by the court, the commissioner, in his report, has not only gone into an elaborate statement of the facts and evidence which he supposed had a bearing on the right, and after intimating an opinion favorable to the validity of the distribution of the estate of George Booth the elder, as alleged in the defendant’s answer, and collating the facts in re* *63 la-lion to the alleged sale of Amy under the attachment of William Booth, sen. arrives at the conclusion, that the debt for which the attachment issued had been previously paid by the complainant, and that William Booth, sen. the defendant, should account for that injury; at the same time suggesting a doubt whether the case was reached by the suit. And if the right had been before settled by the decision of the court, why this doubt of the commissioner? and why investigate the evidence in relation to the question of right? But what is conclusive against the right having been at that time decided, is, the circumstance of the complainant having thereafter filed his supplemental bill, in which he not only recites and relies upon the matter charged in his original bill, but charges the recovery under the attachment to have been fraudulently obtained, and insists upon a decree for the delivery of Amy, &c.
To infer from the absence of the order of court under which the commissioner acted, any thing in support of the argument advanced would, therefore, be in conflict with the commissioner’s report, as well as the allegations of the complainant’s supplemental bill, and ought not to be indulged, though there might be entertained the strongest inclination to presume everything consistent with the record, against a defendant, whose duty it is to produce the entire record, and who should produce partial extracts only.
And with respect to the writing given by the defendant, William Booth, sen. in 1807, it need only he remarked, we understand it not to evince an abandonment of the contest as to the slaves at that time. The supplemental bill of the complainant, as has been already observed, insists upon a decree for Amy; and the judgment, which by that writing was certified to be acknowledged, was restricted to the original bill only. It is most probable that it was intended by giving that writing, to acknowledge judgment for the balance in the account stated by the commissioner in his report upon the original bill, leaving the contest as to the slaves to be finally decided by the court.
If, then, we are correct in supposing the right to the slaves was in contest at the time the obligations were given by the complainant and the defendant William Booth, jun. the conclusion is irresistable, that the exe *64 cution oí those obligations was founded upon an agree-meat of compromise. We draw this conclusion, not from anj peculiar expression contained in either of .those obligations, but from the improbability of a purchase and sale by each of part of the slaves in contest, without an understanding between them that the controversy subsisting should cease, and from the fact that William Booth, sen. for whom William Booth, jun; acted, having within a short time after the obligations were given, disclaimed title to the slaves. ,
A close investigation of the import of mutual obligations, executed at the same time.
Wherfe a bill in chancery alleges a material fact, the truth or falsehood of which must be known to the defendant, and be sues without denying it, it shall be taken as true on the hearing-
1. But though the obligations were founded on á compromise, it does" not thence follow that the complainant has shewn no cause for relief; He is not entitled to relief, if, as is contended by the defendants, the obligation given by William Booth, jun. has been fulfilled; but if not fulfilled, and there has been a breach of its condition, as it is admitted to have been given for William Booth, sen. for whose benefit the judgment at law was obtained, the complainant has shewn an unquestionable equity against the judgment. The equity would nut then arise from an entire failure of the consideration of the obligation upon which the judgment was recovered against the complainant; but it would grow out of a partial failure of the consideration, and the incompetency of a court of law to afford any remedy cither against William Booth, sen. or William Booth, jun. upon the breach of the obligation given by the latter, in consequence of the former having never executed the obligation, and the latter not being within the country.
The proprietyof the decree dismissing the complainant’s bill, must, therefore, essentially turn on the question, whether or not there has been a breach of the condition of the obligation given by William Booth, jun.
2. And here it should be recollected, that there is not only an absence of proof to shew the title of Lucy and her children was in William Booth, sen. at the time William Booth, jun. gave his obligation to the complainant, but the answers of neither defendants contain any denial of the allegation that William Booth, sen. then nor ever since has been possessed of the title, as charged in the complainant’s bill; so that there must have been a breach of the condition of the obligation given by William Booth, jun. if, as is contended on the part of the complainant, the condition imports an un- *65 «lorfakhrg on the pari of William Booth, jun. to cause a perfect titie to Lucy and one half of her children to be made to the complainant; though there may not have been any breach, if the condition barely implies •an undertaking to cause the title (such as it was) of William Booth, sen. to be made, as is contended by the defendants.
That the construction contended for on the part of the defendants, ought r.ot to prevail, is, we apprehend, 'apparent from the language employed in.the condition of that obligation, as well as the obligation given at the same time by the complainant. It was not the right ■of William Booth, sen. which by his obligation William Booth,jun. was to have made; but by the condition of '.'rat obligation he undertook, expressly, “ to make or cause to he made to the complainant a good and lawful •sight, by William Booth, son. to LuCy and one half her children.” ^ The expressions, good and lawful right, might, it is 1 rue, have been satisfied by a transfer of the riget of William, if at the time he possessed the perfect right; but without a complete and perfect right, it is impossible that he could make a good and lawful one to tire complainant. And that the parties understood the import of those expressions, and intended something more tiran the right of William Booth, sen. such as it was, is plainly inferable from the expressions employed in the condition of the obligation given by the complainant. By that condition, the complainant undertook, barely, “to make a good and lawful title of his right to Amy and one half her children.” .Now, as both obligations were executed at the same time, and as by that given by the complainant be barely undertook to make a title of his right, the fair inference is, that something more was intended by the undertaking of William Booth, jun. to cause to be made a good *nd lauful right to Lucy and half her children.
Let it not be supposed that the construction which We have given to the obligation of William Booth, jun. is in conflict witb the subsequent conduct of tire parties. We kuow that shortly after the date of the obligations, William Booth, sen. disclaimed all right to the negroes in contest between him and the complainant, and that after a decree was pronounced upon that disclaimer m favor of the complainant, a power of attorney was given by him-authorising a comedión of bis to searef " r and *66 endeavor to obtain the possession of Lucy and her children. But all this may have been done in perfect consistency with the construction we have put upon the obligations, and in pursuance of the agreement of compromise between the parties. The decree pronounced in favor of the complainant, no doubt, passed to him all right which William Booth, sen. had to the negroes; but by disclaiming all right, William Booth, sen. may have had a different object to attain than to fulfil the condition of the obligation given by William Booth, jun. All the negroes were at that lime in the possession oí other persons, and it may and probably was intended by permitting a decree to go in favor of the complainant, to give a greater semblance of right, in further pursuing the negroes; and besides,when compromising the controversy, it may have been agreed for the decree to be made in favor-of (he complainant for the whole of the negroes, in order the more certainly to secure him in his claim to the other half of the children of both Amy and Lucy, not mentioned in either obligation; and to accomplish that object, IVilliam Booth, sen. may have disclaimed his interest, at the same time intending to leave to each of the contracting parües his recourse upon the obligation given by the other. Possessing' a claim, therefore, to one half of the children of Lucy, over and above the obligation held on William Booth, jun. for a good and lawful right to Lucy and the other half, it was not extraordinary that the complainant after the decree was pronounced, gave the power of attorney to which we have referred. It was natural for him to do so, without intending thereby to release the obligation which he held for the right of Lucy and half her children on William Booth, jun. In fact, there appears to have been no difference in the understanding of the parties on this subject; for it is in proof that after the decree was pronounced in favor of the complainant, William Booth, sen. acknowledged it to he incumbent on him to establish his right to Lucy and her children, before he could recover Amy and half her' children.
Upon the whole, we think that under the obligation William Booth, jun. was bound to make a completé and perfect right to Lucy and half her children; and having not done so, the complainant is entitled té relief.
when diere is no_ a Hoga-contract was marta with an ¿“frauclhi»1 others, the court ought ^hViíior h was or not.
The relief, we also think, should be, a perpetual injunction against the judgment at law; for the proof is dear, that Lucy and half her children are of as great value as Amy and half her children.
3. It may be proper to remark, in answer to an ob-jectiou taken in argument, that ttfc pleadings contain ño charge of the contract between the complainant and William Booth, jun. having been made with intent to defraud others, and without such a charge it cannot have been incumbent on the complainant to introduce •evidence to repel it, nor should it be enquired' into by the court.
The decree must be reversed with costs, the cause remanded to the court below, and a decree there entered in favor of the complainant not inconsistent with this opinion.